RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

v.                                                    Nos. 12-3720/3757

TROY DENNIS HOCKENBERRY (12-3720) and
BILLY HARRIS GRAY, JR. (12-3757),
          *Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:11-cr-00479-2—Christopher A. Boyko, District Judge.

Argued: June 20, 2013

Decided and Filed:  September 19, 2013

Before:  MOORE and GRIFFIN, Circuit Judges; SARGUS, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Gretchen A. Holderman, LILLIE & HOLDERMAN, Cleveland, Ohio, for Appellant in 12-3757.  Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee in 12-3757.  **ON BRIEF:** Vicki Lynn Ward, Cleveland, Ohio, for Appellant in 12-3720.  Gretchen A. Holderman, LILLIE & HOLDERMAN, Cleveland, Ohio, for Appellant in 12-3757.  Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee in 12-3720 and 12-3757.

_____

**OPINION**

_____

     SARGUS, District Judge.     Defendants-Appellants Troy Hockenberry ("Hockenberry") and Billy Gray, Jr. ("Gray") (collectively "Defendants") appeal their

---

     [*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

judgments and sentences in the district court for being felons in possession of firearms in violation of 18 U.S.C. § 922(g)(1). Following the district court's denial of their motions to suppress evidence, Hockenberry and Gray—who were co-Defendants before the district court—pleaded guilty to beings felons in possession of firearms. After finding that both Defendants were armed career criminals pursuant to 18 U.S.C. § 924(e), the district court sentenced Hockenberry to 204 months imprisonment and Gray to 216 months imprisonment. Defendants maintain that the district court erred in denying their motions to suppress. Additionally, each Defendant challenges other aspects of the district court's rulings, including their classifications as armed career criminals. For the following reasons, with regard to Hockenberry, we **AFFIRM** in part, but **REVERSE** the district court's sentence of Hockenberry and **REMAND** for resentencing. We **AFFIRM** the district court's judgment and sentence as to Gray.

## I.

### A.      Traffic Stop and Subsequent Search[1]

On September 1, 2011, at approximately 2:20 p.m., the Youngstown Police Department received a telephone call reporting that a man driving a black Jeep Cherokee was attempting to sell firearms at a local auto parts store. The caller identified himself as an employee of the store. In addition to describing the color and model of the vehicle, the caller provided the vehicle's Pennsylvania license plate number. Youngstown Police Officer George Anderson and ATF Agent Nicholas J. Vouvalis began patrolling the area at approximately 4:00 p.m. Both Officer Anderson and Agent Vouvalis were part of the V-Grip Task Force, a law enforcement unit with the purpose of getting firearms off the streets.

Around 6:00 p.m., Officer Anderson and Agent Vouvalis encountered a Jeep driving through a parking lot with a license plate number matching the earlier report. Both Officer Anderson and Agent Vouvalis testified that, shortly thereafter, they

---

[1]The following factual summary is based primarily on the testimony of Youngstown Police Officer George Anderson and ATF Agent Nicholas J. Vouvalis at the February 22, 2012 suppression hearing.

witnessed the driver turn without signaling.  The officers initiated a traffic stop.  The officers conducted a felony traffic stop, ordering the vehicle's occupants to exit the vehicle.  After the vehicle pulled over, both officers drew their weapons.  The officers secured the vehicle occupants and patted them down for weapons.

The vehicle contained Gray, who was driving, as well as Hockenberry and Patricia Hunt.  The vehicle was registered to Troy and Kelly Hockenberry.  After ordering the occupants from the vehicle, Officer Anderson and Agent Vouvalis discovered that neither Gray nor Hockenberry had valid driver's licenses.  The officers also eventually learned that there were active arrest warrants for Ms. Hunt, the third individual in the vehicle.  Once they discovered that neither Gray nor Hockenberry had an active license, Officer Anderson and Agent Vouvalis decided to tow the vehicle.  The officers did not give Hockenberry an opportunity to call someone to retrieve the vehicle.  Prior to any search of the vehicle, the officers asked Hockenberry whether there were guns in the vehicle.  Hockenberry did not respond to the question.

Officer Anderson and Agent Vouvalis testified that they performed an inventory search prior to towing the vehicle pursuant to the policy of the Youngstown Police Department.  The Youngstown Police Department policy provided as follows:

5.29    TOWED VEHICLES — ADMINISTRATIVE INVENTORY

The purpose of the following procedure is to:

A.      Protect officers from danger.

B.      Protect property in police custody.

C.      Insure against frivolous claims of lost, stolen, and/or damaged property.

In all cases, when any officer of the department lawfully impounds a motor vehicle, a complete, detailed inventory of the vehicle shall be conducted.  This includes opening all closed containers and listing the contents thereof.  Officers shall inventory all areas of the vehicle accessible to them, including all compartment of the vehicle that can be opened without being damaged.

All packages, bags, suitcases, and/or any other types of containers, including containers found inside other containers shall be opened and

> inventoried.  The only exception to this is containers that may become damaged if forced open.  Any article, such as a briefcase, found to be locked is to be opened and inventoried if the officer can readily obtain a key or combination of the lock.
>
> All items of value found during the inventory shall be listed in the appropriate sections on the Towed Car Report (PD-3) and continued on a Supplemental Report Form (PD-4), if necessary.

(Gov't Resp. Mot. Supp., Dist. Ct. Docket No. 33, 3.)  At the February 2012 suppression hearing,  Officer Anderson summarized the policy as requiring officers to remove everything of value and everything that may be related to a crime from the vehicle.

Upon opening the back tailgate of the vehicle, the officers immediately viewed a handgun case as well as the barrels of long guns.  In addition to several guns, the vehicle contained an assortment of other items including tools, clothing, duffel bags, and drug paraphernalia.  Officer Anderson testified that within his police report he listed the "items of value or obvious contraband" that he discovered during the search.  (Supp. Tr., Dist. Ct. Docket No. 78, 14–15.)  Officer Anderson admitted there were some items that he left in the vehicle and did not inventory.  According to Officer Anderson, he did not think that some of the items in the car were valuable items.

Officer Anderson ultimately cited Gray for failure to signal and driving under suspension.

On September 8, 2011, one week after the above incident, Officer Anderson sought a warrant to conduct a second search of the vehicle.  Officer Anderson stated that he had received information from a local store indicating that there might be stolen property within the vehicle.  In requesting the search warrant, Officer Anderson submitted a sworn affidavit to the Youngstown Municipal Court.  Officer Anderson averred that "during the inventory search I only seized those items which were obviously contraband at the time."  (*Id.* at 47.)  On September 9, 2011, after receiving a search warrant, Officer Anderson searched the vehicle. The second search revealed that several items—including a crowbar and bolt cutters—were left in the car after the initial September 1, 2011 search.

**B.     Suppression Hearing and Guilty Pleas**

On October 20, 2011, a grand jury indicted Gray and Hockenbury for possession of firearms as felons in violation of 18 U.S.C. § 922(g)(1).  The grand jury also indicted Defendants for unlawfully transporting stolen goods in interstate commerce in violation of 18 U.S.C. § 2314.

Both Defendants moved to suppress evidence that the Government obtained through the September 1, 2011 vehicle search.  The district court held a suppression hearing on February 22, 2012.  Officer Anderson and Agent Vouvalis testified at the hearing.  At the end of the hearing, the district court orally denied the motions to suppress.  The court first found that the officers had  probable cause to stop the vehicle, crediting their testimony that they witnessed a traffic violation.  The court then reasoned:

> And the question really is this:  Was this an unconstitutional search; not whether the City of Youngstown's policy was violated.  That's two separate things.  We can't mix the two.  There is probable cause, which this Court finds the stop was proper.
>
> Once that stop was proper, based upon the information that the officers had at that time, they can approach with extreme caution, can draw their guns, can order people out because, number one, Officer Anderson spoke specifically with [the caller]; verified the information.  The plate was exact.  The color was exact.  It was a Jeep.
>
> All that information matched.  Sure, it is V Grip's job to get guns off the street, and it doesn't matter whether that was their objective.  The question really is, first, whether there was probable cause, and based upon that and based upon the information that they had and verified, that is, Gray was under suspension, Hockenberry didn't have a license, and Hunt had warrants, there is no obligation whatsoever to release that vehicle to any of them or have them call somebody to pick it up.
>
> There is no legal obligation to do that.  The vehicle can be towed.  Once that decision is made, it can be inventoried; not whether the policy was complied with to the T.  To me, it doesn't rise to [] an unconstitutional violation.
>
> Maybe Officer Anderson is subject to [] discipline by his department.  That's their call.  As far as a constitutional violation, I don't see it.  Probable cause to stop, proper decision to tow, once that's made, [an]

inventory search can be done and was done.  I don't see any unconstitutional act here.

The policy were it violated doesn't mean it is [a] constitutional violation.  Again, it could subject him to internal discipline, but the two are totally separate inquiries.  It is not to say that [a] violation of policy could never be a constitutional violation, but it doesn't rise to that level in this case.

(Supp. Tr., Dist. Ct. Docket No. 78, 95–97.)

Following denial of their motions to suppress, Defendants entered into conditional plea agreements wherein each agreed to plead guilty to being a felon in possession of a firearm.  The plea agreements contained appellate waiver provisions in which Hockenberry and Gray waived appellate rights, "except as specifically reserved below."  (Hockenberry Plea Agreement, Dist. Ct. Docket No. 53, 6; Gray Plea Agreement, Dist. Ct. Docket No. 54, 6.)  Gray and Hockenberry reserved the right to appeal:

(a) any punishment in excess of the statutory maximum; (b) any sentence to the extent it exceeds the greater of any mandatory minimum sentence or the maximum of the imprisonment sentencing range determined under the advisory Sentencing Guidelines, using the Criminal History Category found applicable by the Court; (c) the Court's determination of Defendant's Criminal History Category and/or classification of Defendant as an Armed Career Criminal; or (d) the right to appeal the Court's order denying Defendant's Motion to Suppress Evidence.

(*Id.*)   During Defendants' change of plea hearings, the Court questioned Defendants—pursuant to Federal Rule of Criminal Procedure 11—to ensure that they understood their various rights.

## C.     Sentencing

### 1.       Hockenberry

The district court sentenced Hockenberry on June 6, 2012.  At his sentencing hearing, Hockenberry initially moved to withdraw his guilty plea.  Hockenberry indicated that at the time of his guilty plea he was experiencing a great amount of stress and was not taking his medication.  After questioning Hockenberry and his counsel, the

district court denied Hockenberry's request. The district court specifically concluded that Hockenberry knowingly, intelligently, and voluntarily entered the plea, and that he failed to demonstrate fair and just reasons for withdraw of the plea.

For the purposes of sentencing, Hockenberry requested 120 months imprisonment. Hockenberry objected to any application of the Armed Career Criminal Act ("ACCA"), maintaining that his prior Pennsylvania conviction for fleeing or attempting to elude police was not a "violent felony" within the meaning of 18 U.S.C. § 924(e)(2)(B).[2]

In sentencing Hockenberry, the district court first found that Hockenberry was an armed career criminal. The district court specifically concluded, relying on this Court's precedent, that the crime of fleeing and eluding under Pennsylvania law was categorically a violent felony within the meaning of the ACCA. In light of the court's finding that Hockenberry was an armed career criminal, the mandatory minimum was 180 months. The district court's guideline calculation resulted in a range of 188 to 235 months. The court sentenced Hockenberry to a 204 month term of imprisonment.

## 2.    Gray

The district court sentenced Gray on June 15, 2012. The presentence investigation report ("PSR") classified Gray as an armed career criminal based on two burglaries committed in Pennsylvania during September 2002 as well as a 2007 conviction for failure to comply with a police officer under Ohio law. The Pennsylvania court sentenced Gray for the two 2002 burglaries on the same date.

Like Hockenberry, Gray requested a 120 month term of imprisonment. Gray maintained that he was not an armed career criminal. Although Gray conceded within his sentencing memorandum that he had two prior burglary convictions, he asserted that these convictions were not for violent felonies under the ACCA. Gray also contended that his Ohio conviction for failure to comply was not a violent felony within the

---

[2]Hockenberry does not dispute that his prior convictions for burglary and robbery qualify as predicate offenses for the purposes of the ACCA.

meaning of the ACCA. The Government, in support of an armed career criminal finding, submitted certified charging documents, as well as file-stamped copies of Gray's signed guilty pleas, from the two Pennsylvania burglaries.

At the June 15, 2012 sentencing hearing, the district court concluded that Gray was an armed career criminal. The court found from the charging documents that Gray committed generic burglaries, violent felonies under the ACCA. The court also determined that Gray's conviction for failure to comply under Ohio law was a violent felony. In applying the sentencing guidelines and ACCA, the court calculated a sentencing range of 188 to 235 months, with a mandatory minimum of 180 months. The court ultimately sentenced Gray to 216 months confinement.

## II.

We begin by jointly addressing Defendants' challenges to the district court's denial of their motions to suppress evidence. We will then consider Defendants' individual arguments separately, including their challenges to classification as armed career criminals.

### A.     Motions to Suppress

Defendants maintain that the district court erred in denying their motions to suppress the evidence the Government obtained during the September 1, 2011 vehicle search. Gray first contends that Officer Anderson and Agent Vouvalis lacked probable cause to stop the vehicle. Both Defendants further assert that (1) Officer Anderson and Agent Vouvalis failed to follow standardized inventory search procedures in searching the vehicle and (2) the purported inventory search of the vehicle was a pretext for an investigatory search.

#### 1.     Standard of Review

When considering the denial of a motion to suppress evidence, "we review the district court's factual findings under the clear-error standard and its legal conclusions de novo." *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) (citing *United*

*States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)). The Court must "consider the evidence in the light most favorable to the government." *Woods*, 711 F.3d at 740. "A finding is clearly erroneous only if the record as a whole leaves the reviewing court with the definite and firm conviction that a mistake has been committed." *Kerman v. Comm'r*, 713 F.3d 849, 867 (6th Cir. 2013) (internal quotation marks omitted).

### 2.     Discussion

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." *United States v. Jones*, ___ U.S. ___, 132 S.Ct. 945, 949 (2012).

"An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). A police officer, however, may lawfully stop a vehicle when he or she has "probable cause to believe that a traffic violation has occurred." *Id.* "The Fourth Amendment . . . permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile, regardless of the officer's subjective motivation for the stop." *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003) (citing *Whren*, 517 U.S. at 812–13). Consequently, "[a] driver's failure to use a turn signal provides probable cause to justify a traffic stop irrespective of the officer's subjective intent." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). "'[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *United States v. Ware*, 465 F. App'x 487, 494 (6th Cir. 2012) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977)); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (extending *Mimms* to passengers). Moreover, an officer may frisk an individual for weapons upon a reasonable suspicion that the individual is armed and dangerous. *Ware*, 465 F. App'x at 494 (citing *Arizona v. Johnson*, 555 U.S. 323, 331 (2009)).

In considering any subsequent search of the vehicle, we must begin "with the basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation marks omitted). "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Wren*, 517 U.S. at 811 n.1.

"A warrantless inventory search may only be conducted if police have lawfully tak[en] custody of a vehicle." *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007) (internal quotation marks omitted); *see also Jackson*, 682 F.3d at 455 ("It is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment."). This Court has held that "[d]iscretion as to impoundment is permissible so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Jackson*, 682 F.3d at 454 (citations omitted) (internal quotation marks omitted); *see also United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) ("The Fourth Amendment permits impoundment decisions . . . that are objectively justifiable . . . regardless of an officer's subjective intent."). Furthermore, an impoundment decision will not be impermissible simply because alternatives to impoundment might exist. *See Kimes*, 246 F.3d at 805 (holding that officer were not required to "take[] it upon themselves to call [the defendant's] wife and ask her to get the vehicle"); *cf. also United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir. 1994) ("Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory.").

With regard to the actual performance of an inventory search, our Court has recently summarized:

> "In order to be deemed valid, an inventory search may not be undertaken for purposes of investigation, and it must be conducted according to standard police procedures." [*Smith*, 510 F.3d] at 651 (citation and internal quotation marks omitted). A general written inventory policy does not grant officers carte blanche when conducting a search; rather, it must be sufficiently tailored to only produce an inventory. [*United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007)]. Thus, "[i]n conducting an inventory search, officers do not enjoy their accustomed discretion; they simply follow the applicable policy." *Id.* "Nonetheless, officers may exercise some judgment based on concerns related to the purposes of an inventory search; for example, they may decide to open particular containers if they cannot determine the contents." *Id.* (citation and internal quotation marks omitted). "When a legitimate search is underway, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." [*Bertine*, 479 U.S. at 375] (citation and internal quotation marks omitted).

*Jackson*, 682 F.3d at 455.

In other terms, officers are required to follow "standardized criteria . . . or established routine" to assure that inventory searches are not "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). At the same time, however, "there is no reason to insist that [inventory searches] be conducted in a totally mechanical 'all or nothing' fashion." *Id.* Additionally, when considering the comprehensiveness of an inventory list, "an officer's use of discretion in implementing agency guidelines regarding the conduct of an inventory search does not necessarily violate the Fourth Amendment." *Kimes*, 246 F.3d at 805. In *Kimes*, we specifically held that a standardized policy of "listing only 'valuable' items is not impermissible, and neither is a measure of flexibility regarding the implementation of that policy." *Id.* We further reasoned that "[t]he post-discovery

listing of items discovered in a search, moreover, has no pertinent connection to the discovery itself." *Id.*

Finally, we must consider whether the evidence establishes that the "police acted in bad faith or for the sole purpose of investigation" in conducting an inventory search. *United States v. Vite-Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003) (citing *Bertine*, 479 U.S. at 372–73). Nevertheless, although inventory searches "may not be undertaken for the purposes of investigation, . . . the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Smith*, 510 F.3d at 651 (citations omitted) (internal quotation marks omitted).

Here, as an initial matter, Officer Anderson and Agent Vouvalis had probable cause to stop Defendants' vehicle. Gray maintains that there was no probable cause to stop the vehicle. He specifically contends that—given the earlier weapons report—the officers' testimony that they immediately saw the vehicle commit a traffic violation is too convenient to be credible. This contention is unpersuasive. Both Officer Anderson and Agent Vouvalis expressly testified to witnessing the vehicle commit a traffic violation by failing to signal. Additionally, in the face of cross examination, neither officer admitted that they planned to stop the vehicle no matter the circumstances. In light of such testimony, it was not clear error for the district court to conclude that the officers witnessed a traffic violation. Accordingly, regardless of the officers' subjective motivations, the vehicle stop was permissible. Moreover, given the earlier report regarding weapon sales, it was reasonable for the officers to have their guns drawn, order the occupants from the vehicle, and frisk the occupants for weapons.

Officer Anderson and Agent Vouvalis' decision to impound the vehicle was also reasonable under the circumstances. The officers pulled over the vehicle on a public street. An information check revealed that Gray, the driver of the vehicle, was operating under a suspended licence.[3] A background check further revealed that Hockenberry, the

---

[3]Notably, under the local ordinances of Youngstown, at least in their current form, a police officer is authorized to impound a vehicle when it is "operated by any person who is driving without a lawful license or while his license has been suspended or revoked and is located upon a public street." Youngstown, Ohio, Ordinance § 303.08 (codified 1995, amended 2013). At the suppression hearing,

owner of the vehicle, did not have a valid license.  Although Ms. Hunt—the third individual in the car—did have a valid license, she was not the owner of the car and a background check eventually revealed that she had active warrants for her arrest.[4] Considering these factors, Officer Anderson and Agent Vouvalis acted within their discretion in deciding to tow the vehicle.  Moreover, the officers were not required to allow Defendants an alternative method of securing the vehicle.

Given the above circumstances, Officer Anderson and Agent Vouvalis' performance of an inventory search was objectively justifiable.  The officers had probable cause to stop the vehicle and made a reasonable decision to impound the vehicle.  Accordingly, it was proper to conduct an inventory search following this series of events.  At the same time, however, some of the evidence calls into question whether the inventory search was pretextual.  The officers testified that they questioned Hockenberry about whether there were guns in the vehicle prior to performing the search.  Additionally, as the district court insinuated, it appears that the officers failed to strictly follow all of the requirements of the Youngstown Police Department's inventory search policy.  The evidence—including a subsequent search of the vehicle—reflects that the officers did not inventory all items within the vehicle.  The record also indicates that, despite the policy instruction to list all items of value, Officer Anderson omitted many items from his list.  Furthermore, Officer Anderson's testimony demonstrated a less than ideal understanding of the purposes of an inventory search.  Although Officer Anderson was able to identify some of the main goals of an inventory search, such as securing valuable items and preventing frivolous claims, he also repeatedly stated that part of the reason for the search was to identify contraband that might pertain to a crime.

---

Officer Anderson could not recall whether impounding a vehicle for driving under suspension was stated policy, but he did testify that it was standard procedure.

[4] It is not entirely clear from the record exactly when the officers learned that there were active warrants for Ms. Hunt's arrest.  (*See* Supp. Tr., Dist. Ct. Docket No. 78, 60, 66.)  Agent Vouvalis' testimony indicates that the officers decided to tow the vehicle before learning of the arrest warrants.  (*See id.* at 65–66.)  According to Vouvalis, they did not allow Ms. Hunt to take the vehicle because they had not yet run her information through the Youngstown Police Department's index; she had no entitlement to the vehicle; and the vehicle's driver was under arrest for driving under suspension.  (*Id.* at 66.)

Ultimately, however, the district court did not err in denying the motions to suppress.  Although officers must follow standardized procedure in conducting an inventory search, the law allows for some flexibility and practical judgment in how such searches are carried out.  Consequently, as the district court recognized, the question is "not whether the policy was complied with to the T."  (Supp. Tr., Dist. Ct. Docket No. 78, 96.)  Here, under the circumstances in this case, it is not clear from the evidence that the officers were acting in bad faith or for the sole purposes of investigation.  In light of the vehicle stop and decision to impound, the officers were justified in conducting an inventory search.  Upon opening the vehicle, the officers immediately saw weapons.  Moreover, with regard to the listing of inventory items, the circumstances of this case are highly similar to the circumstances of *Kimes*.  In particular, Officer Anderson was entitled to "a measure of flexibility" in determining what items in the vehicle were "valuable" for the purposes of the inventory search policy.  *See Kimes*, 246 F.3d at 805.  Finally, "[t]he post-discovery listing of items discovered in a search . . . has no pertinent connection to the discovery itself."  *Id.*

## B.     Hockenberry

Moving to Defendants' individual arguments, Hockenberry contends that the district court erred in denying his motion to withdraw his guilty plea.  Moreover, Hockenberry asserts that the district court incorrectly classified him as an armed career criminals pursuant to 18 U.S.C. § 924(e), resulting in a mandatory minimum sentence of fifteen years.  We will first address whether the district court erred in denying Hockenberry's motion to withdraw and then consider the district court's armed career criminal finding.[5]

---

[5]Within briefing, Hockenberry also challenges the district court's calculations of the sentencing guidelines and the reasonableness of the court's ultimate sentence.  For the reasons described below, we find that the district court erred in finding Hockenberry to be an armed career criminal. Consequently, pursuant to 18 U.S.C. § 922(g), the statutory maximum sentence for Hockenberry should have been 120 months imprisonment.  Under these circumstances, remand for resentencing is appropriate and we find it unnecessary to address Hockenberry's remaining arguments.

**1.       Withdraw of Guilty Plea**

As detailed above, at the June 2012 sentencing hearing, the district court denied Hockenberry's oral motion to withdraw his guilty plea.  Hockenberry, however, asserts that he presented sufficient justification for withdraw.  Hockenberry also maintains that his testimony calls into question whether his plea was knowing and intelligent.

"We review de novo whether a defendant's plea was entered knowingly, voluntarily, and intelligently; however, [t]he underlying factual bases relied upon by the district court are reviewed for clear error." *United States v. Catchings*, 708 F.3d 710, 716 (6th Cir. 2013) (internal quotation marks omitted).  On the other hand, "we review for abuse of discretion the district court's denial of a motion to withdraw a guilty plea." *Id.* at 717.  "A district court abuses its discretion where it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.*

"A guilty plea is valid if it is entered knowingly, voluntarily, and intelligently." *United States v. Young Ko*, 485 F. App'x 102, 104 (6th Cir. 2012).  "The validity of a guilty plea is assessed by reviewing the totality of the circumstances surrounding the plea." *Id.*  The defendant must have a "sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970).

Under Federal Rule of Criminal Procedure 11(d), a defendant may withdraw a guilty plea upon "show[ing] a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  We look at the totality of the circumstances in considering whether a defendant has made a sufficient showing, including the following non-exclusive factors:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had

prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Catchings*, 708 F.3d at 717–18 (quoting *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994)).  If the defendant is unable to establish fair and just reasons, it is not necessary for the Court to consider prejudice to the Government.  *Catchings*, 708 F.3d at 719.

In this case, the record sufficiently demonstrates that Hockenberry entered his guilty plea knowingly, voluntarily, and intelligently.  At Hockenberry's February 29, 2012 change of plea hearing, the district court performed a thorough Rule 11 colloquy.  Moreover, Hockenberry testified that he understood the case proceedings; had a clear mind; was not under the influence of drugs or alcohol; and understood that he was giving up various rights by pleading guilty.

At the sentencing hearing, Hockenberry testified to being stressed, tired, and off his medication at the time of his guilty plea.  Hockenberry also testified that prior to his arrest he had been using cocaine and heroine.  Nevertheless, the sentencing hearing testimony does not reflect that Hockenberry lacked a general understanding and awareness of his circumstances at the time of his guilty plea.  Moreover, the district court recalled that Hockenberry had answered questions clearly, and had not appeared unaware, at the time of the guilty plea.  Under these circumstances, the district court did not err in finding Hockenberry's guilty plea knowing, voluntary, and intelligent.

The district court also did not abuse its discretion in denying Hockenberry leave to withdraw.  Hockenberry did not make a sufficient showing of fair and just reason for withdrawal.  Although Hockenberry pleaded guilty on February 29, 2012, he did not begin discussing withdrawal with his attorney until mid-May and he did not actually move to withdraw until his June 6, 2012 sentencing hearing.  *See United States v. Benton*, 639 F.3d 723, 727 (6th Cir. 2011) ("This Court has declined to allow plea withdrawal when intervening time periods were as brief as one month.").  At his change of plea hearing, in addition to pleading guilty, Hockenberry admitted that the Government could prove the factual basis for the crime in question.  In seeking to

withdraw the plea, Hockenberry stated that he wished "to fight this case[,]" but did not go as far as to maintain his innocence.  (Hockenberry Sentencing Tr., Dist. Ct. Docket No. 83, 7.)  Finally, as the district court recognized, the record reflects that Hockenberry was familiar with the criminal justice system at the time of the proceedings in this case.  Considering these factors and the totality of the circumstances, the district court did not err in denying Hockenberry's motion to withdraw.

### 2.     Application of the Armed Career Criminal Act

The district court classified Hockenberry as an armed career criminal based on prior convictions for burglary and robbery as well as a conviction for fleeing or attempting to elude a police officer under Pennsylvania law.  Hockenberry maintains that the district court erred in counting his fleeing conviction as a violent felony.

### a.     Standard of Review

We review determinations as to whether a conviction qualifies as a "violent felony" under the ACCA *de novo*.  *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013).  We review a district court's factual findings at sentencing, including findings as to the existence of prior convictions, for clear error.  *United States v. Crowell*, 493 F.3d 744, 748 (6th Cir. 2007).

"This court applies a plain-error standard of review where . . . a defendant fails to raise a claim during the sentencing procedures."  *United States v. Lumbard*, 706 F.3d 716, 720 (6th Cir. 2013).  As the Court has recently described, plain-error review involves a four-step inquiry pursuant to Federal Rule of Criminal Procedure 52(b):

> First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end.  However, if an error occurred, we then consider if the error was plain.  If it is, then we proceed to inquire whether the plain error affects substantial rights.  Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 721 (internal quotation marks omitted).

**b.      Armed Career Criminal Act**

The ACCA provides in part:

In the case of a person who violates section 922(g) of this title and has *three previous convictions* by any court referred to in section 922(g)(1) of this title *for a violent felony* or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

18 U.S.C. § 924(e)(1) (emphasis added).  The ACCA defines violent felony as follows:

(B)      the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—

(i)      has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii)     is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B).

In considering whether an offense is a violent felony, the Court must employ a categorical approach.  *Sykes v. United States*, 564 U.S. ___, 131 S.Ct. 2267, 2272 (2011).  Under such an approach the Court "look[s] only to the fact of conviction and the statutory definition of the prior offense, and do[es] not generally consider the particular facts disclosed by the record of conviction."  *Id.* (internal quotation marks omitted).  In a "narrow range of cases," however, the statute of conviction will "set[] out one or more elements of the offense in the alternative," some of which amount to a violent felony while others do not.  *Descamps v. United States*, ___ U.S. ___, 133 S. Ct. 2276, 2281, 2283 (2013) (internal quotation marks omitted).  In the case of such a "divisible" statute,

*id.* at 2293, "we may look at the indictment, guilty plea and similar documents to see if they 'necessarily' establish the nature of the prior offense." *United States v. Ford*, 560 F.3d 420, 422 (6th Cir. 2009) (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)).

### c.     Discussion

Once again, Hockenberry maintains that the district court erred by counting his conviction for fleeing or attempting to elude for the purposes of the ACCA. Hockenberry was specifically convicted, under Pennsylvania law, for the second-degree misdemeanor of fleeing or attempting to elude a police officer. *See* 75 Pa. Const. Stat. § 3733(a.2)(1). Hockenberry contends that his fleeing offense should not count as a violent felony because (1) it was not punishable by more than one year imprisonment and (2) the offense does not fall within the ACCA's residual clause. Hockenberry did not raise the first issue below, and, therefore, it is subject to plain-error review.

To be considered a violent felony a crime must first be "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 924(e)(2)(B). Importantly, for the purpose of this case, the ACCA further provides:

(a)     As used in this chapter—

\* \* \*

    (20)    The term "crime punishable by imprisonment for a term exceeding one year" does not include—

\* \* \*

        (B)     any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

18 U.S.C. § 921(a)(20)(B); *see also* Logan v. United States, 552 U.S. 23, 37 (2007) (noting that Congress, in passing § 921(a)(20), " sought to qualify as ACCA predicate offenses violent crimes that a State classifies as misdemeanors yet punishes by a substantial term of imprisonment, *i.e.*, more than two years"). Breaking down § 921(a)(20)(B), this Court has recognized—in an unpublished decision—that the

exception requires both (1) that the offense be classified as a misdemeanor and (2) that the offense be punishable by two years or less.[6] *United States v. Burchard*, 60 F.3d 829, 1995 WL 385109, at \*2 (6th Cir. June 27, 1995) (table).

Under Pennsylvania law, "[a]ny driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop . . . when given a visual and audible signal to bring the vehicle to a stop, commits an offense as graded in subsection (a.2)."  75 Pa. Const. Stat. § 3733(a).  The fleeing or attempting to elude statute further provides:

> (a.2) Grading.—
>
> (1)    Except as provided in paragraph (2), an offense under subsection (a) constitutes a misdemeanor of the second degree. Any driver upon conviction shall pay an additional fine of $500. This fine shall be in addition to and not in lieu of all other fines, court expenses, jail sentences or penalties.
>
> (2)    An offense under subsection (a) constitutes a felony of the third degree if the driver while fleeing or attempting to elude a police officer does any of the following:
>
>> (i)      commits a violation of section 3802 (relating to driving under influence of alcohol or controlled substance);
>>
>> (ii)     crosses a State line; or
>>
>> (iii)    endangers a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase.

75 Pa. Const. Stat. § 3733(a.2).  Pennsylvania law further provides that "[a] crime is a misdemeanor of the second degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is *not more than two years*."  18  Pa. Const. Stat. § 106(b)(7) (emphasis added).

---

[6]Within briefing, neither party expressly addresses the application of § 921(a)(20)(B) to the Pennsylvania fleeing or attempting to elude offense.  Prior to oral argument, we alerted the parties to the potential application of the provision to the Pennsylvania fleeing or attempting to elude offense.  The government subsequently conceded that, in light of § 921(a)(20)(B), Hockenberry should not have been subject to an ACCA enhancement.

Here, in light of 18 U.S.C. § 921(a)(20)(B), Hockenberry's conviction for fleeing or attempting to elude is not punishable by imprisonment for a term exceeding one year within the meaning of the ACCA. It is undisputed—both on appeal and before the district court—that Hockenberry pleaded guilty to the lower offense level, a second degree misdemeanor. Applying the above authority, Hockenberry's offense was therefore both (1) classified as a misdemeanor and (2) punishable by a term of imprisonment of two years or less. Accordingly, the district court erred in counting this conviction as a violent felony.

Moreover, the district court's categorization of Hockenberry's fleeing or attempting to elude conviction as a violent felony was plain error.[7] *Cf. United States v. Mays*, 285 F. App'x 269, 275 (6th Cir. 2008) (holding that a misapplication of a mandatory minimum under 18 U.S.C. § 924(c) was plain error). The district court's error was plain, as Hockenberry's second degree misdemeanor conviction falls squarely within the 18 U.S.C. § 921(a)(20)(B) exception to crimes punishable by more than one year imprisonment. Furthermore, the error impacted Hockenberry's substantial rights because he was subject to a fifteen-year mandatory minimum as an armed career criminal. Accordingly, we will exercise our discretion to reverse this error because it resulted in Hockenberry receiving a sentence that he did not qualify for under the applicable statute.[8]

**C.     Gray**

In addition to contesting the denial of his motion to suppress, Gray also maintains that the district court erred in (1) classifying him as an armed career criminal in light of prior convictions for burglary and failure to comply; and (2) sentencing him to

---

[7] At the same time, the district court's error was understandable. Notably, the exception within 18 U.S.C. § 921(a)(20)(B) would never be material to an Ohio crime because under Ohio law "[a]ny offense not specifically classified is a misdemeanor if imprisonment for not more than one year may be imposed as a penalty." Ohio Rev. Code § 2901.02.

[8] Because the Pennsylvania offense was not a "crime punishable by imprisonment for a term exceeding one year," it is unnecessary for the Court to consider whether the offense satisfies the ACCA's residual clause.

216 months imprisonment.  We will begin by addressing application of the ACCA and then consider the reasonableness of Gray's ultimate sentence.

### 1.     Application of the Armed Career Criminal Act

The district court found Gray to be an armed career criminal based on two prior burglary convictions under Pennsylvania law and a conviction for failure to comply under Ohio law.  Gray contends that the district court committed several errors in determining that he was an armed career criminal.  Specifically, Gray asserts that (1) there was insufficient proof of the prior convictions; (2) his 2002 burglary convictions should be treated as a single offense; (3) his Pennsylvania burglary convictions were not violent felonies within the meaning of the ACCA; and (4) his Ohio conviction for failure to comply was not a violent felony under the ACCA.[9]

### a.     Proof of Prior Convictions

Gray first contends that the district court had insufficient proof of his three prior convictions to find that he was an armed career criminal.  Gray faults the Government for producing only charging documents with regard to his burglaries and no evidence of his Ohio failure to comply conviction.

As a preliminary matter, Gray maintains that, for the purposes of the ACCA, the Government must prove the existence of his prior convictions to a jury beyond a reasonable doubt.  This Court has already rejected this position.  We have specifically held that "previous convictions under the ACCA are treated as sentence enhancements, not offense elements."  *United States v. Anderson*, 695 F.3d 390, 398 (6th Cir. 2012).  Accordingly, in determining whether the ACCA applies, "a judge is permitted to find, based on the preponderance of the evidence, the fact of a prior conviction."  *Id.* (internal quotation marks omitted).

---

[9]Gray failed to raise his first two contentions before the district court.  Accordingly, plain-error review applies.

Generally, "[b]y failing to object to the presence report, [a defendant] accept[s] all of the factual allegations contained in it." *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc); *see also United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004) ("The district court is allowed to accept as true all factual allegations in a presence report to which the defendant does not object."). Authority from this Court also reflects that a district court may rely on unchallenged PSR findings to establish the *existence* of prior convictions. *See, e.g.*, *United States v. Birdsong*, 330 F. App'x 573, 586 (6th Cir. 2009) (holding that a district court did not err in relying on a PSR when the defendant did not specifically challenge "the correctness of any particular conviction identified in the report"); *United States v. Thomas*, 13 F. App'x 233, 241 (6th Cir. 2001) (holding that, absent objections at sentencing, a district court could rely on a PSR to establish the existence of prior convictions for an ACCA enhancement). At the same time, this Court has held that PSR findings are not *Shepard* material and may not be used to establish the specific nature of a conviction. *United States v. Wynn*, 579 F.3d 567, 576–77 (6th Cir. 2009) (concluding that a district court could not rely on a factual description within a PSR to establish the specific nature of a defendant's conviction even when the defendant had failed to object to the PSR); *cf. also United States v. Sosa*, 448 F. App'x 605, 608 (6th Cir. 2012) ("Consistent with *Shepard's* 'comparable judicial record' provision, courts have been cautious about expanding the range of permissibly considered evidence beyond *Shepard's* restricted set of documents.").

In this case, the district court did not err—or at the very least did not commit plain error—in finding sufficient proof of Gray's prior convictions. The PSR found that Gray had a number of prior convictions, including the three prior convictions the district court relied upon in reaching its armed career criminal determination. Although Gray objected to classification as an armed career criminal, he did not challenge the existence of any of the three prior convictions. Rather, within his sentencing memorandum, Gray conceded—at least implicitly—that he had been convicted of the prior offenses. (*See* Gray Sentencing Mem., Dist. Ct. Docket No. 62, 3–7.) Moreover, the Government produced a certified charging document, along with file-stamped copies of Gray's pleas, to prove the nature of Gray's prior burglary convictions. Such circumstances provided

the district court with a sufficient basis to find the existence of the three predicate convictions.

### b.     Counting of Burglaries

Gray next contends that his 2002 burglaries constitute only one prior conviction for the purposes of the ACCA. Gray maintains that because he was sentenced to the burglaries on the same dates, the Court should not count the prior sentences separately. Gray specifically relies on United States Sentencing Guideline § 4.A1.2(a)(2)(B), which provides:

Definitions and Instructions for Computing Criminal History

(a)     Prior Sentence

* * *

(2)     If the defendant has multiple prior sentences, determine whether those sentences are counted separately or as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, *prior sentences are counted separately unless* (A) the sentences resulted from offenses contained in the same charging instrument; or (B) *the sentences were imposed on the same day*. Count any prior sentence covered by (A) or (B) as a single sentence.

U.S. Sentencing Guidelines Manual § 4A1.2(a)(2) (emphasis added).

The ACCA requires three previous convictions committed "on occasions different from one another." 18 U.S.C. § 924(e)(1). "This circuit has further clarified that under the ACCA, a career criminal is one who has been convicted of three criminal 'episodes.'" *United States v. McCauley*, 548 F.3d 440, 448 (6th Cir. 2008). "Although related to the entire course of events, an episode is a punctuated occurrence with a limited duration." *Id.* (internal quotation marks omitted). Accordingly, crimes that a defendant commits against different victims, in different places, and at different times,

will generally be separate offenses.  *See id.*  We have also provided that even when convictions "were sentenced on the same day, they count separately for purposes of calculating an ACCA enhancement."  *United States v. Kearney*, 675 F.3d 571, 575 n.5 (6th Cir. 2012).  Finally, contrary to Gray's position, we have held that the ACCA does not apply the same standards as § 4A1.2(a)(2) of the Guidelines.  *Birdsong*, 330 F. App'x at 585–86.

Under the circumstances of this case, the district court correctly counted Gray's 2002 burglary convictions as separate offenses.  For the purposes of sentencing, the Government submitted certified charging documents which indicate the burglaries took place on different dates and that Gray committed the burglaries against different victims.  Such documents are sufficient to establish that the burglaries are separate offenses under the ACCA.

### c.     Burglaries as Violent Felonies

Gray also challenges whether his burglaries qualify as violent felonies within the meaning of the ACCA.  Gray maintains that burglary, under Pennsylvania law, includes both generic burglary and broader conduct.  Additionally, Gray asserts that the charging documents fail to establish that Gray's underlying conduct was either violent or aggressive.

The ACCA explicitly lists "burglary" as an example of a violent felony. 18 U.S.C. § 924(e)(2)(B)(ii).  "The Supreme Court, however, has read this enumerated example to mean a 'generic burglary,' which the Court defined as 'unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime.'" *United States v. Jones*, 673 F.3d 497, 505 (6th Cir. 2012) (quoting *Taylor v. United States*, 495 U.S. 575, 599 (1990)).  "If a defendant's conviction falls under a non-generic burglary statute—which is broader than generic burglary and may, for example, include entry into structures other than buildings or not require criminal intent—it does not automatically qualify for sentence-enhancement purposes." *United States v. Leasure*, 455 F. App'x 564, 566 (6th Cir. 2011).  In the case of such an overbroad statute, "a later sentencing court cannot tell, without reviewing something

more, if the defendant's conviction was for the generic . . . or non-generic . . . form of burglary." *Descamps v. United States*, ___ U.S. ___, 133 S. Ct. 2276, 2284 (2013).

In such a case, "[w]hen the law under which the defendant has been convicted contains statutory phrases that cover several different generic crimes, some of which require violent force and some of which do not," the Supreme Court has approved of applying a modified categorical approach. *Johnson v. United States*, 559 U.S. 133, 144 (2010). Under the modified categorical approach, sentencing courts are permitted "to examine a limited class of documents" to determine whether a defendant's conviction was for a generic or non-generic burglary. *Descamps*, 133 S. Ct. at 2283–84. A court using this approach may look to "the indictment or information and jury instructions" to demonstrate that "a jury was actually required to find all the elements of generic burglary." *Taylor*, 495 U.S. at 602. When a defendant enters a guilty plea, the Court must consider whether the relevant *Shepard* materials are sufficient to establish, by a preponderance of the evidence, that the defendant pleaded guilty to the elements of generic burglary.[10] *Sosa*, 448 F. App'x at 607–08.

However, the Supreme Court recently clarified that the modified categorical approach may be used only if the statute of conviction is "divisible." *Descamps*, 133 S. Ct. at 2293. A divisible statute is one that "lists multiple, alternative elements, and so effectively creates 'several different . . . crimes.'" *Id.* at 2285 (quoting *Nijhawan v. Holder*, 557 U.S. 29, 41 (2009)). The Court has given as an example of a divisible statute a burglary provision that "criminalizes breaking into a 'building, ship, vessel or vehicle.'" *Nijhawan*, 557 U.S. at 35 (quoting Mass. Gen. Laws, ch. 266, § 16 (West 2006)). Because such a statute lists alternative, disjunctive elements, the sentencing court is permitted to look at the *Shepard* documents "to determine which of a statute's alternative elements formed the basis of the defendant's prior conviction." *Descamps*, 133 S. Ct. at 2284.

---

[10]Charging documents, such as an information, are acceptable under *Shepard*. *See United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (noting that a felony information was indisputably a *Shepard* document).

Here, the parties do not dispute that the relevant Pennsylvania burglary statute covers conduct broader than generic burglary. The statute Gray was convicted of provided:

> A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter.

18 Pa. Const. Stat. § 3502(a) (2002).[11] Although the above language matches the Supreme Court's definition of generic burglary, Pennsylvania law defines "occupied structure" broadly to include "[a]ny structure, vehicle or place adapted for overnight accommodation of persons, or for carrying on business therein, whether or not a person is actually present." 18 Pa. Const. Stat. § 3501. This statute mirrors the Supreme Court's example of a divisible statute because it lists alternative elements in the statutory text, criminalizing entering a "building *or* occupied structure" with the relevant criminal intent. Accordingly, we conclude that the Pennsylvania statute is divisible, as the *Descamps* Court uses that term. The sentencing court therefore was permitted to apply the modified categorical approach and look to the *Shepard* documents to determine "which statutory phrase was the basis for the conviction." *Johnson*, 559 U.S. at 144.

The district court possessed sufficient evidence to conclude that Gray pled guilty to generic burglaries. Once again, the Government produced certified copies of the charging documents—specifically informations—for the burglaries. The informations reflect that Gray was charged with—and thus ultimately pled guilty to—unlawfully entering two buildings. Gray was specifically charged with unlawfully entering the "Tic Toc Food Mart" and "the business of Cox's Corner" with the intent to commit thefts therein. In light of this information, the district court did not err in finding that Gray's 2002 convictions were for generic burglary.

---

[11]The language of § 3502(a) was amended in 2012.

### d.     Failure to Comply as a Violent Felony

Finally, Gray maintains that his failure to comply conviction under Ohio law is not a violent felony.  In particular, Gray asserts that the offense does not fall within the ACCA's residual clause.

As the language of the ACCA details, violent felonies include crimes that expressly include  an element of physical force as well as crimes specifically listed in 18 U.S.C. § 924(e)(2)(B)(ii).  Additionally, violent felonies are crimes that "otherwise involve[] conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii).  This provision is known as the residual clause.  The Supreme Court has provided, with regard to the residual clause, that "a crime involves the requisite risk when the risk posed by [the crime in question] is comparable to that posed by its closest analog among the enumerated offenses." *Sykes v. United States*, 564 U.S. ___, 131 S.Ct. 2267, 2273 (2011).

Initially, Gray maintains that the residual clause is unconstitutionally vague.  In *Sykes*, Justice Scalia took this position in dissent, stating, "[w]e have demonstrated by our opinions that the clause is too vague to yield 'an intelligible principle,' . . . each attempt to ignore that reality producing a new regime that is less predictable and more arbitrary than the last." *Sykes*, 131 S.Ct. at 2287–88 (Scalia, J., dissenting) (citation omitted).  The *Sykes* majority, however, rejected this position, holding that the residual clause "states an intelligible principle and provides guidance that allows a person to conform his or her conduct to the law." *Id.* at 2277.  We are bound by the majority's holding.

Here, Gray was convicted of a fourth-degree felony for failure to comply under Ohio Revised Code § 2921.331.  The Ohio statute provides in pertinent part:

> (B)     No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

(C)  (1)  Whoever violates this section is guilty of failure to comply with an order or signal of a police officer.

* * *

(4)  Except as provided in division (C)(5) of this section, a violation of division (B) of this section is a felony of the fourth degree if the jury or judge as trier of fact finds by proof beyond a reasonable doubt that, in committing the offense, the offender was fleeing immediately after the commission of a felony.

(5)(a)  A violation of division (B) of this section is a felony of the third degree if the jury or judge as trier of fact finds any of the following by proof beyond a reasonable doubt:

(i)  The operation of the motor vehicle by the offender was a proximate cause of serious physical harm to persons or property.

(ii)  The operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property.

Ohio Rev. Code § 2921.331.

In *Sykes*, the Supreme Court held that a similar statute—an Indiana crime prohibiting vehicle flight—was a violent felony under the residual clause. 131 S.Ct. at 1270–71. The Court reasoned that "[s]erious and substantial risks are an inherent part of vehicle flight." *Id.* at 2276. In *United States v. Doyle*, 678 F.3d 429 (6th Cir. 2012), this Court held—after considering the impact of *Sykes*—that a Tennessee law prohibiting vehicle flight was a violent felony under the ACCA. 678 F.3d at 437. Notably, the flight offense at issue in *Doyle* did not require a finding that the defendant actually created a risk of death or injury to another. *Id.* at 432. The *Doyle* Court explained that "potential risks to officers *always* are present in vehicular-flight cases, even if actual risk of harm to third parties is not, as officers must eventually confront those who have already once intentionally disregarded their lawful authority." *Id.* at 436.

Finally, we recently addressed whether the same Ohio failure to comply offense at issue here was a violent felony. *See United States v. Yates*, 501 F. App'x 505,

511–515 (6th Cir. 2012). This Court held that a fourth-degree felony for failure to comply was categorically a violent felony under the ACCA. *Id.* at 513–15. In addition to following the reasoning of *Sykes*, the Court also recognized that the element of "fleeing immediately after the commission of another felony" further demonstrated the heightened level of risk involved. *Id.* at 514–15.

In light of the above authority, Gray's prior conviction for failure to comply under Ohio law constitutes a violent felony under the ACCA. The record reflects that Gray was convicted of a fourth-degree felony, flight immediately after a felony. Moreover, the decision to flee police in a vehicle presents an inherent risk of physical injury to others comparable to the crimes listed within 18 U.S.C. § 924(e)(2)(B)(ii). Accordingly, the district court properly counted the conviction as a predicate offense.

### 2.       Reasonableness of Gray's Sentence

Finally, Gray asserts that the district court's sentence of 216 months was unreasonable and greater than necessary. The Government maintains that, through his plea agreement, Gray waived the right to appeal this issue.

"It is well settled that a defendant may waive any right, even a constitutional right, by means of a plea agreement." *United States v. Toth*, 668 F.3d 374, 377 (6th Cir. 2012). "[A]n appeal waiver is enforceable if the defendant's waiver of his appellate rights was knowing and voluntary." *Id.* at 378. The Court reviews whether a defendant waived the right to appeal an issue *de novo*. *Id.*

In this case, Gray entered into a plea agreement in which he waived appellate issues not expressly reserved. As detailed above, Gray reserved the right to appeal:

> (a) any punishment in excess of the statutory maximum; (b) any sentence to the extent it exceeds the greater of any mandatory minimum sentence or the maximum of the imprisonment sentencing range determined under the advisory Sentencing Guidelines, using the Criminal History Category found applicable by the Court; (c) the Court's determination of Defendant's Criminal History Category and/or classification of Defendant as an Armed Career Criminal; or (d) the right to appeal the Court's order denying Defendant's Motion to Suppress Evidence.

(Gray Plea Agreement, Dist. Ct. Docket No. 54, 6.) The record reflects that the waivers were knowing and voluntary. Specifically, in response to the district court's questioning during his plea hearing, Gray confirmed that he was waiving various appellate rights.

In light of the waiver provision, Gray has waived his right to appeal the reasonableness of his sentence. The ultimate reasonableness of Gray's within-guidelines sentence is outside the scope of the appellate rights Gray reserved within his plea agreement.

Even assuming Gray has not waived the issue, however, his sentence was reasonable. We review "a district court's sentence for abuse of discretion, whether inside, just outside, or significantly outside the Guidelines range, and for both procedural and substantive reasonableness." *United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012). A district court must impose a sentence "not greater than necessary" to comply with the general purposes of sentencing. 18 U.S.C. § 3553(a). Moreover, a district court must consider a variety of factors including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; and the need to avoid unwarranted sentence disparity. *Id.*

The district court did not err in sentencing Gray. Gray briefly submits that the district court's sentence was unreasonable and greater than necessary. Gray, however, fails to explain why this is the case. Regardless, the district court's sentence was justified under the circumstances. Based on Gray's armed career criminal status, the Court applied a guideline range of 188 to 235 months. After reviewing Gray's individual characteristics, the district court sentenced Gray to 216 months, slightly towards the upper end of the guideline range. In light of Gray's extensive criminal history, which was approximately four times the level necessary to place him in the Guideline's highest criminal history category, the district court's sentence was reasonable.

Finally, Gray contends—in cursory fashion—that his sentence was grossly disproportionate and, therefore, violated the Eighth Amendment prohibition on cruel and

unusual punishment.  Gray fails to develop this line of argument and there is no basis for reaching such a conclusion.

### III.

For the foregoing reasons,  we **AFFIRM** in part, **REVERSE** in part, **VACATE** the district court's sentence of Hockenberry, and **REMAND** for resentencing in light of this Opinion.  We **AFFIRM** the district court's judgment and sentence as to Gray.